UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
ABILENE DIVISION

JUANA HIGAREDA-CANO,

     Petitioner,

v.

KRISTI NOEM, et al.,

     Respondents.

No. 1:25-CV-225-H

## <u>ORDER</u>

Juana Higareda-Cano entered the United States illegally over 30 years ago and has remained here since.  In September, U.S. Immigration and Customs Enforcement (ICE) detained Higareda-Cano and placed her in custody at the Bluebonnet Detention Center in Anson, Texas.  An immigration judge denied a bond hearing, citing a lack of jurisdiction. *See Matter of Yajure Hurtado*, 29 I. & N. Dec. 216 (BIA 2025).  She now petitions the Court for a writ of habeas corpus, alleging that her detention without bond violates the INA, the Due Process Clause, and the Ex Post Facto Clause.  Dkt. No. 1.

But her argument fails on multiple levels.  First, it flatly contradicts the statute's plain language.  As "[a]n alien present in the United States who has not been admitted," she is an "applicant for admission" subject to Section 1225's mandatory-detention provision.  Second, the history of legislative changes confirms this result.  Previously, aliens who entered illegally without inspection received more rights than aliens who entered lawfully.  By defining "applicant for admission" to include all aliens who have not been admitted and mandating detention for this category, Congress eliminated the prior incentives to enter illegally.  Finally, common sense supports this conclusion.  The law, in Higareda-Cano's reading, would mandate detention for aliens who lawfully apply for admission, are caught

at or near the border, or seek admission after entering illegally—while aliens who are able to enter illegally and remain undetected for years are entitled to potential release after being caught. The INA, unsurprisingly, does not bestow heightened procedural protections to illegal aliens based on their stealth and impenitence.

As an "applicant for admission," Higareda-Cano must be detained without bond under Section 1225(b)(2)(A). Her due process claim—whether substantive or procedural— fails, too. And because Higareda-Cano's detention post-dates *Yajure Hurtado*, her Ex Post Facto Clause claim is frivolous. Accordingly, the petition (Dkt. No. 1) is denied.

**1.    Background**

In 1994, Higareda-Cano illegally crossed into the United States at or near El Paso, Texas. Dkt. No. 1 ¶ 19. More than 30 years later, ICE conducted a raid on Higareda-Cano's home in Dallas, searching for her children's father. *Id.* ¶ 20. They found Higareda-Cano instead and detained her for being in the United States without authorization. *Id.*; Dkt. No. 10 at 7. DHS issued a Notice to Appear, which charged her with removability as an alien "not in possession of a valid unexpired immigrant visa, reentry permit, border crossing card, or other valid entry document required by the [INA]." Dkt. No. 10 at 7; *see* 8 U.S.C. § 1182(a)(6)(A)(i), (a)(7)(A)(i)(I).

Higareda-Cano indicates that she has no criminal history. Dkt. No. 1 ¶ 24. She is an active member of her local Catholic Church, held a managerial position at her company, and has U.S. citizen children and lawful permanent resident parents. *Id.* ¶¶ 23–24. In 2005, Higareda-Cano received an I-130 family visa. *Id.* ¶ 25. Shortly after Higareda-Cano's detention on September 12, 2025, her daughter filed for a new I-130 visa petition that would permit Higareda-Cano to adjust her status. *Id.* ¶¶ 12, 26.

While detained, Higareda-Cano challenged ICE's custody determination—including its decision that she must be detained without bond—before an immigration judge. Dkt. Nos. 1 ¶ 24; 9 at 11. The immigration judge found that he lacked jurisdiction to consider Higareda-Cano's bond request. Dkt. No. 10 at 12. In doing so, he relied on the Board of Immigration Appeals' recent opinion in *Matter of Yajure Hurtado*, holding that aliens present in the United States without admission must be detained without bond under Section 1225(b)(2)(A) of the INA for the duration of their removal proceedings. 29 I. & N. Dec. at 220. Higareda-Cano reserved the right to appeal, though it is unclear if she has done so. Dkt. No. 10 at 12.[1]

Instead, on the day of her request's denial, Higareda-Cano filed a petition for a writ of habeas corpus. Dkt. No. 1. The petition states four claims for relief. First, she alleges that her detention without bond violates the INA. *Id.* ¶¶ 83–85. She argues that Section 1225(b)(2)(A) does not apply to aliens who, like her, previously entered the United States illegally and have been living in the country prior to being apprehended and placed in removal proceedings. *Id.* ¶ 84. In Higareda-Cano's view, the proper statutory authority for her detention is Section 1226(a), which permits immigration judges to release aliens on bond while their removal is pending. *Id.* ¶ 30. Second, she argues that, since her detention should fall under Section 1226(a), ICE is violating its own regulations in detaining her. *Id.*

---

[1] Typically, a "person seeking habeas relief must first exhaust available administrative remedies." *Hinojosa v. Horn*, 896 F.3d 305, 314 (5th Cir 2018). The respondents do not raise exhaustion in their answer, and an exhaustion requirement in this context is likely prudential, not jurisdictional. *See* 8 U.S.C. § 1252(d)(1) (requiring exhaustion only for a "final order of removal"). That said, it would be "an exercise in futility" for Higareda-Cano to appeal to the BIA. *Garner v. U.S. Dep't of Lab.*, 221 F.3d 822, 825 (5th Cir. 2000). The BIA issued *Yajure Hurtado* on September 5, 2025. Given the recency, there is little prospect that the BIA would reconsider *Yajure Hurtado* here. Thus, Higareda-Cano's habeas petition does not present an exhaustion problem. *See id.*

¶¶ 90–91.  Third, she contends that her detention without bond violates her due process

rights.  *Id.* ¶¶ 86–89.  Fourth, she argues that her detention violates Article I's Ex Post Facto

Clause.  *Id.* ¶¶ 63–67.[2]  Higareda-Cano also filed a motion for a temporary restraining order

or preliminary injunction.  Dkt. No. 2.

The Court ordered the respondents to show cause why Higareda-Cano's petition

should not be granted.  Dkt. No. 6; *see* 28 U.S.C. § 2243.  The respondents timely answered

(Dkt. Nos. 9; 10) and Higareda-Cano replied (Dkt. No. 11).[3]  In an order dated December

19, 2025, the Court denied Higareda-Cano's TRO motion.  Dkt. No. 12.  The petition is

now ripe for review.

## 2.    Legal Standard

"[A]bsent suspension, the writ of habeas corpus remains available to every individual

detained within the United States."  *Hamdi v. Rumsfeld*, 542 U.S. 507, 525 (2004) (citing U.S.

Const. art. I, § 9, cl. 2).  With 28 U.S.C. § 2241, Congress authorized federal courts to

resolve habeas petitions, including in immigration-detention cases.  *Zadvydas v. Davis*, 533

---

[2] Higareda-Cano's prayer for relief also seeks "[d]eclaratory judgment . . . declaring that EWI noncitizens"—that is, Higareda-Cano and those similarly situated—"encountered in the interior long after their entry who are placed in removal proceedings [under Section 1225(b)(2)] are entitled to a bond hearing before a neutral adjudicator."  Dkt. No. 1 at 36.  The broad language of this relief might suggest a quasi-class-wide form of relief.  But such relief is inappropriate, at the very least, without a motion for class certification.  *See Surovtsev v. Noem*, No. 1:25-CV-160, 2025 WL 3264479, at *8 (N.D. Tex. Oct. 31, 2025).  Moreover, any challenge that seeks to declare "Section 1225(b)'s implementation as a whole" unlawful must be brought in the District for the District of Columbia, rather than this Court.  *Calderon Lopez v. Lyons*, ___ F. Supp. 3d ___, 2025 WL 3683918, at *11 (N.D. Tex. Dec. 19, 2025) (internal quotation marks omitted); *see* 8 U.S.C. § 1252(e)(3)(A).  The Court therefore construes Higareda-Cano's request for declaratory relief as an individual request.

[3] Higareda-Cano's reply brief is 57 pages in length.  Counsel for Higareda-Cano is reminded to review the Local Civil Rules.  For a summary judgment or equivalent motion, "the length of a principal brief must not exceed 50 pages and a reply brief must not exceed 25 pages."  Loc. Civ. R. 56.5(b).  The Court, at its discretion, may permit the parties to file briefs beyond the page limit.  Loc. Civ. R. 7.2(c).  The Court exercises its authority and permits the brief but admonishes counsel to move for leave to file an oversized brief in the future.

U.S. 678, 687–88 (2001).  Habeas exists solely to "grant relief from unlawful imprisonment or custody."  *Pierre v. United States*, 525 F.2d 933, 935–36 (5th Cir. 1976).  Thus, for the writ to issue, the petitioner must be "in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3); *see Orellana v. Kyle*, 65 F.3d 29, 31 (5th Cir. 1995).  A court considering a habeas petition must "determine the facts, and dispose of the matter as law and justice require."  28 U.S.C. § 2243.

### 3.    Analysis

As noted above, Higareda-Cano raises four claims in her habeas petition—two involving Sections 1225 and 1226 of the INA and its implementing regulations, and two based on the Constitution's Due Process and Ex Post Facto Clauses.  Dkt. No. 1 ¶¶ 63–67, 86–89.  Her arguments are similar to those the Court rejected in *Montelongo Zuniga v. Lyons*, ___ F. Supp. 3d ___, No. 1:25-CV-221, 2025 WL 3755126 (N.D. Tex. Dec. 29, 2025).  Even so, the Court considers the arguments raised in Higareda-Cano's briefing to address whether the bond-less detention of aliens present in the United States without admission violates the INA, the INA's implementing regulations, or the Constitution.  On each count, the answer is no.

### A.    The INA authorizes Higareda-Cano's detention without bond.

Higareda-Cano's claim under the INA involves the interplay between two related statutes.  First is Section 1225(b)(2)(A), the INA's mandatory-detention provision.  That statute sets out detention requirements for "applicant[s] for admission" to the United States.  8 U.S.C. § 1225(b)(2)(A).  Specifically, "in the case of an alien who is an applicant for admission, if the examining immigration officer determines that an alien seeking admission is not clearly and beyond a doubt entitled to be admitted, the alien shall be detained for a

proceeding under section 1229a of this title." *Id.* No one disputes that, subject to certain narrow exceptions,[4] Section 1225(b)(2)(A) "mandate[s] detention of applicants for admission until certain [removal] proceedings have concluded." *Jennings v. Rodriguez*, 583 U.S. 281, 297 (2018). Nothing in Section 1225 "says anything whatsoever about bond hearings." *Id.*

Section 1226(a), on the other hand, permits discretionary detention. "On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States." 8 U.S.C. § 1226(a). Instead of detention, the Attorney General "may" release the alien on bond, "[e]xcept as provided in subsection (c)." *Id.* § 1226(a), (2)(A)–(B). Section 1226(c) in turn requires the Attorney General to "take into custody any alien" who is inadmissible or removable for involvement in certain criminal offenses. *Id.* § 1226(c)(1)(A)–(E); *see Jennings*, 583 U.S. at 303. If Section 1226(c) does not apply, and if an alien is released on bond pending removal, the Attorney General may still re-detain her "at any time." 8 U.S.C. § 1226(b).

The respondents only justify Higareda-Cano's detention under Section 1225(b)(2)(A). *See* Dkt. No. 9 at 18. The question, then, is whether Higareda-Cano—who surreptitiously crossed the border without inspection and has resided illegally in the United States for over three decades—is an "applicant for admission." 8 U.S.C. § 1225(b)(2)(A). If

---

[4] The Secretary of Homeland Security may temporarily parole into the United States "any alien applying for admission" on a "case-by-case basis for urgent humanitarian reasons or significant public benefit." 8 U.S.C. § 1182(d)(5)(A); *see Biden v. Texas*, 597 U.S. 785, 806 (2022). But once the purposes of the parole have been served, the alien must immediately be returned to custody, and her case "shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A).

so, she "shall be detained" without bond.  *Id.*  If not, she is entitled—at the very least—to a bond hearing under Section 1226(a).

> **i.    As an "applicant for admission," Higareda-Cano is subject to mandatory detention without bond under Section 1225(b)(2)(A).**

As always, the Court "begins with the statutory text, and ends there as well if the text is unambiguous."  *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004).  Here, the text is as unambiguous as can be.  Section 1225 broadly defines "applicant for admission" as "[a]n alien present in the United States who has not been admitted or who arrives in the United States."  8 U.S.C. § 1225(a)(1).  Higareda-Cano is an "alien."  She is "present in the United States."  And she "has not been admitted" because she did not "lawful[ly] ent[er] [the country] after inspection and authorization by an immigration officer."  *Id.* § 1101(a)(13)(A) (defining "admission" and "admitted").  As an "applicant for admission" who "is not clearly and beyond a doubt entitled to be admitted," Higareda-Cano "shall be detained" under Section 1225(b)(2)(A).  She is not entitled to a bond hearing.

Higareda-Cano resists this straightforward conclusion.  As she sees it, Section 1225(b)(2)(A) applies only to (1) "an 'applicant for admission'" who is (2) "'seeking admission,'" (3) is "determined by an examining immigration officer to be 'not clearly and beyond a doubt entitled to be admitted,'" and is "apprehended while seeking to enter the country."  Dkt. No. 1 ¶¶ 47, 49 (quoting 8 U.S.C. § 1225(b)(2)(A)).  It does not, in her view, govern those aliens who are "already residing in the United States, including those who are charged with inadmissibility."  *Id.* ¶ 49.

Why?  Because when it comes to "applicant[s] for admission," the statute requires detention "if the examining immigration officer determines that an alien *seeking admission* is not clearly and beyond a doubt entitled to be admitted."  8 U.S.C. § 1225(b)(2)(A)

(emphasis added).  As the argument goes, aliens who have resided in the United States for years after entering illegally are not "seeking admission" and thus are not subject to mandatory detention.  This argument suffers from several flaws.

### a.    The Text of Section 1225

First, it ignores the plain text of the statute.  Section 1225 expressly defines "applicant for admission."  That definition covers "[a]n alien present in the United States who has not been admitted *or* who arrives in the United States."  8 U.S.C. § 1225(a)(1) (emphasis added).  The word "or" is key.  As the Supreme Court has often said, "'or' is 'almost always disjunctive.'"  *Encino Motorcars, LLC v. Navarro*, 584 U.S. 79, 87 (2018) (quoting *United States v. Woods*, 571 U.S. 31, 45 (2013)).  Nothing in Section 1225(b)(2)(A) suggests otherwise.  Therefore, the term "applicant[s] for admission" does not just cover arriving aliens; it also covers aliens who, like Higareda-Cano, are present in the United States—for decades even—without admission.

This interpretation tracks how other courts understand the term.  In *Jennings*, the Supreme Court explained that, "[u]nder [Section 1225], an alien who 'arrives in the United States,' or 'is present' in this country but 'has not been admitted,' is treated as 'an applicant for admission.'"  583 U.S. at 287 (quoting 8 U.S.C. § 1225(a)(1)).  And the BIA—with its considerable expertise in immigration law—recognizes that Congress' "unconventional" definition of "applicant for admission" includes "not just those who are expressly seeking permission to enter, but also those who are present in this country without having formally

requested or received such permission."[5]  *Matter of Lemus-Losa*, 25 I. & N. Dec. 734, 743
(BIA 2012).  At any rate, "[w]hen a statute includes an explicit definition, [the Court] must
follow that definition."  *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018) (quoting
*Burgess v. United States*, 553 U.S. 124, 130 (2008)).

That said, Higareda-Cano strenuously urges that *Jennings* actually stands for the
opposite conclusion, "that [Section 1225(b)] applies at or near the border and [Section]
1226(a) to those encountered in the interior and not subject to expedited removal."  Dkt.
No. 11 at 37.  She reasons this is so because the Attorney General (consistent with then-
existing policy) represented to the Supreme Court that interior removals were governed by
Section 1226 and because Justices Breyer and Sotomayor assumed so in questioning during
oral argument.  *Id.* at 37–40.  She also leans heavily on a line from *Jennings* that states, "U.S.
immigration law authorizes the Government to detain certain aliens *seeking admission into the
country* under [Section 1225]" and "to detain certain aliens *already in the country* pending the
outcome of removal proceedings under [Section 1226]."  Dkt. No. 1 ¶ 62 (emphasis in
original) (quoting *Jennings*, 583 U.S. at 289).

That rebuttal is unpersuasive.  New administrations are "free to reconsider the
government's position."  *Montelongo Zuniga*, 2025 WL 3755126, at *6; *Surovtsev*, 2025 WL
3264479, at *8 (same).  And even if all nine Justices assumed the old rule was mandated by
statute, courts "rely on the parties to frame the issues for decision."  *United States v. Sineng-
Smith*, 590 U.S. 371, 375 (2020) (quotation omitted).  This Court finds *Jennings* amenable to

---

[5] Of course, the Court does not reflexively defer to the BIA's interpretation of Section 1225.  *See
Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412–13 (2024).  But given the BIA's specialized
knowledge of the INA, the Court may consider its "power to persuade."  *Id.* at 402 (quoting
*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

the mandatory-detention view, rather than the one advanced by Higareda-Cano. But if the Supreme Court assumed without deciding that Section 1226 governed cases like Higareda-Cano's, then it is not binding on this Court. *See United States v. Texas*, 599 U.S. 670, 691–92 (2023) (Gorsuch, J., concurring in judgment) (emphasizing the distinction between a court's rationale and its judgment) (citing *Haaland v. Brackeen*, 599 U.S. 255, 294 (2023)).

At any rate, it is better to read a judicial opinion as a whole rather than anchoring upon one slim quote, as Higareda-Cano has done here. *See Reiter v. Sonotone Corp.*, 442 U.S. 330, 341 (1979) (warning against reading "the language of an opinion . . . as though [it were the] language of a statute"). The *Jennings* quote at issue begins, "In sum[.]" 583 U.S. at 289. When one reads the preceding paragraphs, the Supreme Court makes plain that Section 1225(b)(2)(A) *does* extend to an alien who "'is present' in this country but 'has not been admitted.'" *Id.* at 287 (quoting 8 U.S.C. § 1225(a)(1)). The Court further explained that Section 1226 applies to, among others, those "who were inadmissible at the time of entry or who have been convicted of certain criminal offenses *since admission*." *Id.* at 288 (emphasis added). In light of the Supreme Court's extended analysis, Higareda-Cano is mistaken to take a concluding quote and stretch it to embody a contrary principle to the content it summarized. Therefore, *Jennings* does not favor Higareda-Cano.

### b.    "Seeking Admission"

Second, Higareda-Cano's hair-splitting emphasis on the phrase "seeking admission" elevates form over substance. *See* Dkt. No. 11 at 40–41. As the Court previously explained, "[t]here is no material disjunction—by the terms of the statute or the English language—between the concept of 'applying' for something and 'seeking' something." *Garibay-Robledo v. Noem*, ___ F. Supp. 3d ___, No. 1:25-CV-177, 2025 WL 3264482, at *5 (N.D. Tex. Sept.

– 10 –

15, 2025).  An "applicant" is "[s]omeone who requests something."  *Applicant*, Black's Law Dictionary (12th ed. 2024).  Thus, an "applicant for admission," in ordinary English usage, is one who requests (or seeks) admission into the United States.  *See Apply (for)*, Merriam-Webster Thesaurus (noting that to "seek" is a synonym of to "apply" for) (last visited December 17, 2025).[6]  It is unclear how an alien can apply for admission without seeking it.

Other parts of Section 1225 illustrate the point.  Section 1225(a)(3) provides that "[a]ll aliens . . . [w]ho are applicants for admission *or otherwise seeking admission* . . . shall be inspected."  (emphasis added); *see also Shi v. Lyons*, ___ F. Supp. 3d ___, No. 1:25-CV-274, 2025 WL 3637288, at *5 (S.D. Tex. Dec. 12, 2025) (explaining that Section 1225(a)(3)'s "use of 'otherwise' renders 'applicants for admission' a subset of 'seeking admission'—i.e., the former represents one example of the latter").  And Subsection 1225(a)(5) states that "[a]n applicant for admission may be required to state under oath any information sought by an immigration officer regarding the purposes and intentions of the applicant *in seeking admission* to the United States."  (emphasis added).  The logical import of this phrasing is that an "applicant for admission" is also "seeking admission" under the statute.  "Insofar as the term 'applicant for admission' is more passive than 'seeking admission,' this is inherent in the nature of agent nouns and their corresponding gerunds."  *Garibay-Robledo*, 2025 WL 3264482, at *5.  As such, Section 1225 cannot be read to limit its application to aliens "arriving" at the border.

In fact, if Congress wanted to limit Section 1225(b)(2)(A) to arriving aliens, it could have done so.  Neighboring provisions in Section 1225 expressly refer to "arriving alien[s]."  *See, e.g.*, 8 U.S.C. §§ 1225(a)(2) ("arriving alien who is a stowaway is not eligible to apply for

---

[6] https://www.merriam-webster.com/thesaurus/apply%20(for) [https://perma.cc/7FNU-M7C9].

admission or to be admitted"), 1225(d)(2) (addressing "authority to order detention and delivery of arriving aliens" coming to the United States via vessel or aircraft). Yet Congress did not use "arriving alien" in Section 1225(b)(2)(A). Generally, when Congress "uses certain language in one part of the statute and different language in another, the [C]ourt assumes different meanings were intended.'" *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (quotation omitted). So the fact that Congress did not refer to "arriving aliens" in Section 1225(b)(2)(A), but did so in other parts of the statute, suggests that the mandatory-detention provision is not limited to aliens arriving at the border.

In sum, the Court agrees with the respondents that Higareda-Cano is subject to mandatory detention under Section 1225(b)(2)(A). True, she is not an arriving alien. But the statutory text is unambiguous: "[A]n alien present in the United States who has not been admitted" is also an "applicant for admission." 8 U.S.C. § 1225(a)(1). And if an "applicant for admission" is "not clearly and beyond a doubt entitled to be admitted," she "shall be detained" pending her removal proceedings. *Id.* § 1225(b)(2)(A). When a statute is this clear, it must be applied according to its terms. *Carcieri v. Salazar*, 555 U.S. 379, 387 (2009).

### ii.    The statutory history of the INA confirms the Court's reading of the mandatory-detention provision.

"Statutory history, 'the record of enacted changes Congress made to the relevant statutory text over time,' can also provide helpful context" for statutory interpretation. *United States v. Moore*, 71 F.4th 392, 395 (5th Cir. 2023) (quoting *BNSF Ry. Co. v. Loos*, 586 U.S. 310, 329 (2019) (Gorsuch, J., dissenting) (emphasis omitted)). Here, the statutory history of the INA confirms what the plain text already makes clear: aliens who illegally entered the United States and are later apprehended in the interior are "applicant[s] for admission" who must be detained pending removal under Section 1225(b)(2)(A).

– 12 –

In 1996, Congress added the broad definition of "applicant for admission" to the INA in the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA). Pub. L. No. 104-208, 110 Stat. 3009. "Prior to the [IIRIRA], the INA assessed status on the basis of 'entry' as opposed to 'admission.'" *Martinez v. Att'y Gen.*, 693 F.3d 408, 413 n.5 (3d Cir. 2012) (quoting 8 U.S.C. § 1101(a)(13) (1994)). Under this so-called entry doctrine, aliens who snuck into the United States without inspection were entitled to the procedural and substantive protections afforded in deportation proceedings. *Id.* Yet aliens who presented themselves to immigration officials for inspection—say, at a port of entry—were subject to "more summary exclusion proceedings." *Id.* (quotation omitted). This distinction—where aliens who followed the rules and presented for inspection were worse off than those who broke the law—created "a perverse incentive to enter at an unlawful rather than a lawful location." *Dep't of Homeland Sec. v. Thuraissigiam*, 591 U.S. 103, 140 (2020).

IIRIRA did away with this anomaly. Congress replaced the entry doctrine with a criterion based on admission, which it defined as "*lawful* entry . . . after inspection and authorization." 8 U.S.C. § 1101(a)(13)(A) (emphasis added). Congress also added Section 1225(a)(1)—the definition of "applicant for admission"—and mandated detention for all such applicants while their removal proceedings play out. *See* 8 U.S.C. § 1225(b)(2)(A). By defining "applicant for admission" to include all aliens who have not been admitted, Congress thus eliminated the previous incentives to enter the country illegally.

Unconvinced, Higareda-Cano lodges this theory in rebuttal: that IIRIRA's inclusion of the terms "application for admission," "admission," and "admitted" mean that "[a]dmission cannot happen anywhere other than when at the proverbial door asking to come in." Dkt. No. 11 at 17. To make this point, Higareda-Cano relies on the definition of

– 13 –

"admission" in other parts of the INA post-IIRIRA.  She notes that the definition of "application for admission" applies to "admission into the United States," 8 U.S.C. § 1101(a)(4); that the definition of "admission" refers to the "lawful entry of the alien into the United States after inspection and authorization by an immigration officer," *id.* § 1101(a)(13)(A); and that the inadmissible-aliens provision declines to offer a waiver to "an alien who has previously been admitted to the United States as an alien lawfully admitted for permanent residence" if the alien has an aggravated felony conviction or "has not lawfully resided continuously in the United States for a period of not less than 7 years immediately preceding the date of initiation of proceedings to remove the alien from the United States," *id.* § 1182(h).  *See* Dkt. No. 11 at 17–20.

These provisions, on closer inspection, still favor the view that the IIRIRA amendments turn the law's emphasis on illegal entry and presence rather than entry proper. Consider first the language of Section 1101(a)(13)(A).  Subsection (a)(13)(A) is already quite clear it addresses certain forms of "lawful" entry, which already lends itself to the conclusion that those who enter illegally are expressly deprived of the benefits of entry that legal immigrants possess.  Moreover, in the same section, IIRIRA clarifies that parolees, alien crewmen, and various forms of lawful permanent residents may be defined as aliens seeking admission.  *See* 8 U.S.C. § 1101(a)(13)(B), (C)(i), (v).[7]  These are all persons who have been permitted into the United States well beyond the ports of entry—sometimes for years—and yet are considered as applicants for admission.  Thus, subsection (a)(13)(A)

---

[7] Higareda-Cano contends that "[Section] 1101(a)(13)(C) only applies to [lawful permanent residents] who are at the door knocking to come in after a return from travel."  Dkt. No. 11 at 44 n.71.  But the statute says otherwise, as lawful permanent residents might fall into this category by, for instance, committing a crime of moral turpitude or certain drug offenses in violation of state or federal law.  *See* 8 U.S.C. § 1101(a)(13)(C)(v) (citing 8 U.S.C. § 1182(a)(2)).

refers to "lawful entry," rather than entry, and subsection (a)(4)'s use of the phrase "admission into the United States" clearly suggests a recognition of one's lawful presence, rather than mere admission through a port of entry. Thus, Section 1101 favors a policy of restricting illegal immigration beyond the vicinity of the U.S. border.

Next, consider Section 1182(h)'s waiver provision. Higareda-Cano notes that a majority of circuits have held that the waiver provision "precludes eligibility for a waiver after conviction of an aggravated felony only if the alien received [lawful permanent resident] status at the time the alien lawfully entered the United States, but it does not apply to an alien who obtained [lawful permanent resident] status after having been present in the United States before acquiring that status." Dkt. No. 11 at 19 (quoting *Medina-Rosales v. Holder*, 778 F.3d 1140, 1144 (10th Cir. 2015) (collecting cases)); *see also Martinez v. Mukasey*, 519 F.3d 532, 543–44 (5th Cir. 2008). She suggests this area of preference for illegal aliens over legal immigrants favors her reading of IIRIRA. *See id.* But these cases are besides the point, as the INA's waiver provision could extend to illegal aliens who later adjust to lawful-permanent-resident status inasmuch because they were not originally "lawful" entrants just as much as they are (in Higareda-Cano's view) no longer "entrants." *See Mukasey*, 519 F.3d at 544 (emphasizing the elements of lawful entry through inspection and authorization).

Finally, Higareda-Cano notes that both before and after IIRIRA, Section 1255(i) permitted certain illegal aliens with sufficient residency in the United States to adjust to lawful permanent resident status. From this, she reasons that it is "logically irreconcilable" that Congress would "subject every [illegal] alien to the harsh loss of liberty that is mandatory detention" while benefiting certain aliens who evaded capture long enough. Dkt. No. 11 at 34–35. But to qualify under Section 1255(i), the alien must meet certain

conditions, including being in the United States on December 21, 2000.  8 U.S.C. § 1255(i)(1)(C).  If Section 1255(i) were inconsistent with mandatory detention, then it is strange Congress would only protect some aliens and not others.  The simplest explanation is that this is an amnesty provision that does not upset the ordinary operation of the law. Thus, even though Higareda-Cano might be eligible under that provision, she is still not exempt from detention.[8]

At any rate, statutory history is no substitute for the plain language of the statute itself.  It is reinforcement, rather than a load-bearing support.  Suppose that Higareda-Cano had the better read of these provisions: would these change the clear declaration in the mandatory-detention provision that "[a]n alien present in the United States who has not been admitted" is "an applicant for admission," and that aliens who are applicants for admission are subject to mandatory detention in advance of a removal hearing?  8 U.S.C. § 1225(a), (b)(2)(A).  No, and that simple answer sounds in an essential rule of statutory construction: that although statutory terms are presumed to have a common meaning, it is perfectly possible that "the same phrase" can be "used in different parts of the same statute [to] mean[] different things."  *Barber v. Thomas*, 560 U.S. 474, 483–84 (2010).  Even if these other statutes point to a focus on the conduct of aliens at the border and ports of entry, the

---

[8] Higareda-Cano asks, "Does anyone really believe that Congress simultaneously provided [illegal] aliens like [her]—a mother and a human being—with ways to become a [lawful permanent resident] after being illegally present in the United States for more than [ten] years, but only if [she is] willing to go through months of being locked up and deprived of her liberty?"  Dkt. No. 11 at 46.  This point admits the problem: it is a policy argument.  Perhaps Congress ought to have been more gracious to Higareda-Cano.  It could have given her automatic lawful permanent resident status; it could have declared her a citizen; it could have forbade her deportation.  But Congress did none of those things. The amnesty is a limited one, and this is but one consequence of the INA's policy balance.

mandatory-detention provision still extends to those aliens apprehended inside the United States years after entry.

Higareda-Cano's interpretation of Section 1225(b)(2)(A) marks a return to those bygone days before IIRIRA. On her view, aliens who bypass inspection and settle down in the interior have more procedural protections than aliens who present themselves for inspection at the border. *See* Dkt. No. 1 ¶ 34. But that, of course, is "the precise situation that Congress intended to do away with by enacting" IIRIRA. *United States v. Gambino-Ruiz*, 91 F.4th 981, 990 (9th Cir. 2024). Thus, the INA's statutory history supports the view that Section 1225(b)(2)(A) requires detention without bond for all applicants for admission—including those who entered the country illegally and have resided here for years.

### iii.    Higareda-Cano's counterarguments are not persuasive.

Higareda-Cano lodges several additional arguments against applying Section 1225(b)(2)(A). None have merit. She first points to past practice, noting that—until this year—aliens who entered the country illegally and were later placed in standard removal proceedings received bond hearings under Section 1226(a), unless their criminal history made them ineligible. Dkt. No. 1 ¶¶ 34–45. Indeed, after IIRIRA, the Executive Office of Immigration Review issued an interim rule explaining that aliens present in the United States without admission are typically eligible for bond. *See Inspection and Expedited Removal of Aliens; Detention and Removal of Aliens; Conduct of Removal Proceedings; Asylum Procedures*, 62 Fed. Reg. 10312, 10323 (Mar. 6, 1997). That practice continued for several decades.

Then, in July 2025, the U.S. Department of Homeland Security distributed an internal policy (which was later leaked) titled "Interim Guidance Regarding Detention

– 17 –

Authority for Applicants for Admission." *See Maldonado Vazquez v. Feeley*, ___ F. Supp. 3d ___, No. 2:25-CV-1542, 2025 WL 2676082, at *5 & n.2 (D. Nev. Sept. 17, 2025) (describing the leaked DHS policy and noting that the government did not contest its authenticity).  The policy advised that DHS, in coordination with the U.S. Department of Justice, "revisited its legal position" and concluded that Section 1225, not Section 1226, "is the applicable immigration detention authority for all applicants for admission." *ICE Memo: Interim Guidance Regarding Detention Authority for Applications for Admission*, AILA Doc. No. 25071607, Am. Immigr. Laws. Ass'n (July 8, 2025).[9]  Thus, DHS maintained the position— which the BIA later adopted in *Yajure Hurtado*, 29 I. & N. Dec. at 220—that all aliens who entered the country without admission are ineligible for bond.[10]  According to Higareda-Cano, this new policy "rejected well-established understanding of the statutory framework and reversed decades of practice."  Dkt. No. 1 ¶ 42.

On close review, this background hurts Higareda-Cano more than it helps.  The post-IIRIRA interim rule states that "*[d]espite being applicants for admission*, aliens who are present without having been admitted or paroled . . . will be eligible for bond and bond redetermination."  62 Fed. Reg. at 10323 (emphasis added).  "The effect of this change," the rule goes on to explain, "is that inadmissible aliens, except for arriving aliens, have available

---

[9] https://www.aila.org/library/ice-memo-interim-guidance-regarding-detention-authority-for-applications-for-admission [https://perma.cc/5GKM-JYGX]

[10] On December 18, 2025, the Central District of California purported to vacate the DHS policy under the Administrative Procedure Act.  *Maldonado Bautista v. Noem*, No. 5:25-CV-1873, 2025 WL 3678485, at *1 (C.D. Cal. Dec. 18, 2025).  But as this Court explained in *Calderon Lopez*, that purported relief violated the INA.  2025 WL 3683918, at *10–11.  "[B]ecause the Central District lacks jurisdiction under the INA to hear the APA challenge to the DHS policy, its December 18 order lacks the authority necessary to vacate the policy."  *Id.* at *7 n.14.  Even assuming the DHS policy is now vacated, *Yajure Hurtado*'s "broader, independent decision" mandating detention without bond remains in effect.  *Id.* at *1.

to them bond redetermination hearings before an immigration judge, while arriving aliens do not." *Id.* The clear implication of this language is that, despite possessing statutory authority to deny bond to all non-admitted aliens, the government previously declined to exercise the full extent of its authority under the INA.

When the current Trump Administration took office, it was free to reconsider the government's position. As the BIA explained in *Yajure Hurtado*, neither "DHS or its predecessor, the Immigration and Naturalization Service, previously rais[ed] the current [detention] issue" before the BIA. 29 I. & N. Dec. at 225 n.6. Therefore, while "for years Immigration Judges have conducted bond hearings for aliens who entered the United States without inspection," *id.*, that past practice was not required by binding case law. No doubt, "the longstanding practice of the government . . . can inform a court's determination of what the law is." *Loper Bright*, 603 U.S. at 386 (citation modified). "But a 'long-established practice' does not justify a rule that denies statutory text its fairest reading." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 329 (2015). Here, the government's past practice of affording bond hearings to non-admitted aliens cannot overcome the text's clear command.

Next, Higareda-Cano suggests that the respondents' interpretation of Section 1225 cannot be squared with Section 1226. *See* Dkt. No. 1 ¶¶ 39–41. Other courts and petitioners have labeled this a superfluity argument. *See, e.g.*, *Maldonado v. Olson*, 795 F. Supp. 3d 1134, 1151–52 (D. Minn. 2025); *Yajure Hurtado*, 29 I. & N. Dec. at 221–22. To understand the point, some background is helpful. Recall that Section 1226(c) provides exceptions to the discretionary-detention rule. It specifically requires detention of aliens who are inadmissible or removable for involvement in certain criminal offenses. 8 U.S.C. § 1226(c)(1)(A)–(E); *see Jennings*, 583 U.S. at 289. In early 2025, Congress amended Section 1226(c) with the Laken

– 19 –

Riley Act. Pub. L. No. 119-1, 139 Stat. 3 (2025). Under the LRA, the Attorney General must detain any alien who (1) is inadmissible for having entered the country without admission or parole, and (2) is charged with or convicted of specific violent or property-based criminal offenses. 8 U.S.C. § 1226(c)(1)(E)(i)–(ii). The argument goes like this: The LRA requires detention without bond for a subset of non-admitted aliens present in the United States—that is, those responsible for certain crimes. Therefore, it cannot be that Section 1225(b)(2)(A)—enacted nearly 30 years before the LRA—already mandates detention for all such aliens. Otherwise, the LRA's more specific provisions would be superfluous.

For at least three reasons, the Court is unconvinced. First, as Judge Charles Eskridge recently explained, "prior Administrations for decades applied [Section] 1226(a) to individuals like" Higareda-Cano. *Cabanas v. Bondi*, No. 4:25-CV-4830, 2025 WL 3171331, at *6 (S.D. Tex. Nov. 13, 2025). Therefore, "at the time of enactment, the Laken Riley Act *did* have [real] effect, given that it *required* mandatory detention for criminal, inadmissible aliens who had not been subject to it . . . by longstanding practice of prior Administrations." *Id.* (emphasis in original). So, the LRA was not meaningless—it narrowed the discretion afforded to any Administration exercising detention authority under Section 1226.

Second, "it is perfectly possible to interpret the provisions" as taking "a 'belt and suspenders approach' to legislation." *Mejia Olalde v. Noem*, No. 1:25-CV-168, 2025 WL 3131942, at *4 (E.D. Mo. Nov. 10, 2025) (Divine, J.) (quoting *Atl. Richfield Co. v. Christian*, 590 U.S. 1, 14 n.5 (2020)). Section 1226(c) regulates when the Attorney General must take aliens into custody. *Id.* Its detention mandate kicks in "when the alien is released, without regard to whether the alien is released on parole, supervised release, or probation, and

without regard to whether the alien may be arrested or imprisoned again for the same offense." 8 U.S.C. § 1226(c)(1). Section 1225, on the other hand, does not include a timeline. *Mejia Olalde*, 2025 WL 3131942, at *4. It only says that the alien "shall be detained." 8 U.S.C. § 1225(b)(2)(A). It is entirely reasonable, then, to interpret the LRA as providing a temporal gloss on the Executive's detention authority. *See Duke v. Univ. of Tex. at El Paso*, 663 F.2d 522, 526 (5th Cir. 1981) (noting that courts should "avoid[]" interpretations "which render parts of a statute inoperative or superfluous"). On that understanding, the LRA adds something that Section 1225(b)(2)(A) lacks.

Lastly, any superfluity, standing alone, is not enough to depart from the clear statutory text. The Supreme Court "has often recognized [that] '[s]ometimes the better overall reading of [a] statute contains some redundancy.'" *Barton v. Barr*, 590 U.S. 222, 239 (2020) (quoting *Rimini St., Inc. v. Oracle USA, Inc.*, 586 U.S. 334, 346 (2019)). More to the point, "[r]edundancy in one portion of a statute is not a license to rewrite or eviscerate another portion of the statute contrary to its text." *Id.* Indeed, the canons of statutory construction should only "be used to resolve remaining ambiguity," not to inject it where it does not exist. *Moore*, 71 F.4th at 395. Because the statutory text is clear, the Court must apply it as written.

One final point. Higareda-Cano notes that many district courts across the country have rejected the respondents' position. *See* Dkt. No. 1 ¶ 4 & n.3. That does not, however, make them right. This case turns on the statutory text—not on the opinions of other district courts, no matter how informative they may be. Even so, Higareda-Cano's survey of district court authority is not as monolithic as it may seem. Many courts—including several in the Fifth Circuit—have concluded that petitioners like Higareda-Cano are not entitled to a bond

hearing.[11]  Until a higher authority resolves this issue for good, the Court concludes that the INA authorizes mandatory detention for all non-admitted aliens under Section 1225(b)(2)(A).  Moreover, because the INA requires detention in this case, Higareda-Cano's argument that ICE's policy violates its own implementing regulation (*see* Dkt. No. 1 ¶¶ 90–91) fails as a matter of necessity.[12]

### B.    The Due Process Clause does not require the government to give Higareda-Cano a bond hearing.

Next is Higareda-Cano's claim that the government's refusal to provide a bond hearing violates the Due Process Clause of the Fifth Amendment.  Dkt. No. 1 ¶¶ 86–89.  She urges that she "has a fundamental interest in liberty and being free from official restraint," and that her detention "without a bond redetermination hearing to determine whether she is a flight risk or danger to others violates her right to due process."  *Id.* ¶¶ 88–89.  Her claim makes references to both the substantive and procedural rights to due process.  But either way, she is not entitled to relief.

Start with substantive due process.  That doctrine protects "only 'those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and

---

[11] *See, e.g.*, *Montelongo Zuniga*, 2025 WL 3755126, at *7; *Cabanas*, 2025 WL 3171331, at *4; *Mejia Olalde*, 2025 WL 3131942, at *2; *P.B. v. Bergami*, No. 3:25-CV-2978, 2025 WL 3632752, at *3 (N.D. Tex. Dec. 13, 2025); *Rodriguez v. Noem*, ___ F. Supp. 3d ___, No. 9:25-CV-320, 2025 WL 3639440, at *2 (E.D. Tex. Dec. 10, 2025); *Sandoval v. Acuna*, 6:25-CV-1467, 2025 WL 3048926, at *5 (W.D. La. Oct. 31, 2025); *Vargas Lopez v. Trump*, ___ F. Supp. 3d ___, No. 8:25-CV-526, 2025 WL 2780351, at *2 (D. Neb. Sept. 30, 2025); *Chavez v. Noem*, ___ F. Supp. 3d ___, No. 3:25-CV-2325, 2025 WL 2730228, at *4–5 (S.D. Cal. Sept. 24, 2025).

[12] In her petition and reply brief, Higareda-Cano alludes to the potential for Section 1225 arrests in the interior to present a Fourth Amendment violation.  *See* Dkt. Nos. 1 ¶ 52 & n.49; 11 at 14–15, 23–24.  Because Higareda-Cano does not identify a claim for relief under the Fourth Amendment, the Court declines to analyze where Higareda-Cano's seizure and detention present such an issue.  *See Ariwodo v. Hudson*, Civ. A. No. H-06-1907, 2006 WL 2729386, at *4 (S.D. Tex. Sept. 25, 2006) (declining to address habeas claim under Section 2241 where the petitioner did not "articulate[] a clear basis for . . . relief").

tradition.'" *Dep't of State v. Muñoz*, 602 U.S. 899, 910 (2024) (quoting *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997)).  While still recognizing due-process rights for aliens present in the United States, *see, e.g.*, *Trump v. J.G.G.*, 604 U.S. 670, 673 (2025), the Supreme Court has long affirmed the constitutionality of executive immigration procedures. The "through line of history," the Supreme Court recently explained, is "recognition of the Government's sovereign authority to set the terms governing the admission and exclusion of noncitizens." *Muñoz*, 602 U.S. at 911–12.  To that end, "Congress regularly makes rules that would be unacceptable if applied to citizens." *Mathews v. Diaz*, 426 U.S. 67, 80 (1976).

The principle is no less true for immigration detention.  In fact, the Supreme Court has endorsed the constitutionality of detaining aliens without bond during the pendency of removal proceedings.  In *Demore v. Kim*, the Supreme Court acknowledged that "the Fifth Amendment entitles aliens to due process of law in deportation proceedings."  538 U.S. 510, 523 (2003) (quoting *Reno v. Flores*, 507 U.S. 292, 306 (1993)).  But it clarified that "detention during deportation proceedings" is nevertheless a "constitutionally valid aspect of the deportation process." *Id.*  Indeed, "when the Government deals with deportable aliens, the Due Process Clause does not require it to employ the least burdensome means to accomplish its goal." *Id.* at 528.  It follows that "the Government may constitutionally detain deportable aliens during the limited period necessary for their removal proceedings." *Id.* at 526.  Against that backdrop, the notion that substantive due process requires a bond hearing is untenable.

A procedural due process claim cares no better.  Higareda-Cano seeks relief relying on the three-factor balancing test from *Mathews v. Eldridge*, 424 U.S. 319 (1976).  *See* Dkt. No. 1. ¶¶ 74–82.  The *Mathews* test, while common, is not the only tool for resolving

procedural due process challenges.  The Supreme Court said as much: "[W]e have never viewed *Mathews* as announcing an all-embracing test for deciding due process claims." *Dusenbery v. United States*, 534 U.S. 161, 168 (2002).  In fact, the "Supreme Court when confronted with constitutional challenges to immigration detention has not resolved them through express application of *Mathews*."  *Rodriguez Diaz v. Garland*, 53 F.4th 1189, 1206 (9th Cir. 2022).

The application of *Mathews* to Section 1226 cases is "unwarranted on the test's own terms."  *Ladak v. Noem*, ___ F. Supp. 3d ___, No. 1:25-CV-194, 2025 WL 3764016, at *7 (N.D. Tex. Dec. 30, 2025).  The Supreme Court applied *Mathews* in *Landon v. Plasencia*, emphasizing that its balancing test was appropriate for "long-time lawful permanent resident[s]" in contrast to "detentions of aliens at the border or returning lawful permanent residents who had spent time abroad."  *Id.* (citing 459 U.S. 21, 32–34 (1982)).  Aliens in the former category have "gain[ed] admission to our country and [have begun] to develop the ties that go with permanent residence," meriting a level of due process more analogous to that of a citizen.  *Landon*, 459 U.S. at 32.  In the latter category, aliens "request[] a privilege and [have] no constitutional rights."  *Id.*; *Thuraissigiam*, 591 U.S. at 138–39 ("Whatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned.") (quotation omitted)).  Critically, aliens who are released into the United States pending removal are "treated for due process purposes as if stopped at the border." *Thuraissigiam*, 591 U.S. at 139 (internal quotation marks omitted); *see* 8 U.S.C. § 1182(d)(5)(A) (noting that paroled aliens are not admitted and are "dealt with in the same manner as that of any other applicant for admission to the United States"); 8 C.F.R. § 1.2 (same).

Higareda-Cano entered the United States illegally, and she remains in the United States without admission.  Therefore, she is entitled to nothing more than the "limited form of process" that is offered by the respondents under their current deportation policy.  *Ladak*, 2025 WL 3764016, at *7.  With Section 1225, Congress set the procedural rights afforded to aliens who are present in the United States without admission.  "Read most naturally," Section 1225(b)(2)(A) "mandate[s] detention of applicants for admission until certain proceedings have concluded."  *Jennings*, 583 U.S. at 297.  No part of the statute "says anything whatsoever about bond hearings."  *Id.*  Accordingly, Higareda-Cano is not entitled to a bond hearing as a matter of procedural due process.[13]

### C.     Higareda-Cano's Ex Post Facto Clause claim is frivolous.

Finally, Higareda-Cano challenges her detention as violative of the Constitution's Ex Post Fact Clause.  Dkt. Nos. 1 ¶¶ 63–67; 11 at 50–52. An ex post facto law is one of several legislative acts that have one feature in common: they are retroactive.  *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (citing *Collins v. Youngblood*, 497 U.S. 37, 41 (1990)).  ICE detained Higareda-Cano on September 12, 2025.  Dkt. No. 1 ¶ 20.  She did not file her request for bond until October 24, 2025.  *Id.* ¶ 24.  The policies challenged here—the DHS Memorandum and *Yajure Hurtado*—were implemented and decided in early July 2025 and on September 5, 2025, respectively.  *See supra* n.9; 29 I. & N. Dec. at 220.  From the date of

---

[13] Higareda-Cano raises the concern that her detention could last for years.  In 2020, the Third Circuit determined that a bond hearing is necessary "when detention becomes unreasonable." *German Santos v. Warden Pike Cnty. Corr. Facility*, 965 F.3d 203, 211 (3d Cir. 2020) (Bibas, J.) (quotation omitted).  There, the petitioner was held without bond "for more than two-and-a-half years."  *Id.* at 206.  Higareda-Cano's detention is recent, so even if a heightened degree of process is appropriate in long-term detention cases, it is not warranted here.

her detention and for months before she applied for bond, the challenged policies were in place.  Therefore, Higareda-Cano's Ex Post Facto Clause claim is frivolous.

**4.      Conclusion**

In short, Higareda-Cano, as an "applicant for admission," is properly detained without bond under Section 1225(b)(2)(A).  Nothing about the INA, the Due Process Clause, or the Ex Post Facto Clause requires a contrary conclusion.  Thus, the petition for a writ of habeas corpus (Dkt. No. 1) is denied.

So ordered on January 30, 2026.

_____
JAMES WESLEY HENDRIX
UNITED STATES DISTRICT JUDGE